The Chancellor.
The Morris and Essex Railroad Company was incorporated, by an act of the legislature of the state of New Jersey, on the 29th day of January, 1885. The company was invested with all the rights and powers necessary and expedient to survey, lay out, and construct a railroad, or lateral roads, from one or more suitable place or places in the village of Morristown, to intersect one or more place or places in the railroad, known by the name of the New Jersey Railroad and Transportation Company, at Newark or at Elizabethtown, in the county of Essex, or between those places, not exceeding sixty-six feet wide, with as many sets of tracks and rails as they might deem necessary. During the years 1835,1836, and 1837, the company constructed their railroad from Morristown, and intersected the railroad of the New Jersey Railroad and Transportation Company at Newark. The *354 road enters Newark in the northern part of the city, and intersects Broad street at right angles nearly; thence, passing southerly through Broad and Center streets, it intersects the New Jersey railroad at the foot of Center street, and at a distance of about three or four hundred feet from the Passaic river. Broad street is the principal , street of the city of Newark. ■ The railroad occupies this street for a distance of little over a quarter of a mile; the line of the road through Center street is less, the length of the road through both streets being little over half a mile. Thé legal supervision and control of the public highways of the city of Newark are vested in the mayor and common council of the city of Newark, and they are amenable to the laws for the maintenance and preservation of those streets for the public uses and purposes to which they were originally dedicated. On the 4th of August, 1854, the defendants passed a preamble and resolution, as follows: “ Whereas the Morris and Essex Railroad, for a considerable period of time, have had a track for their use lying along Broad street, Park place, and Center street; that said track is a great detriment to the convenience of the public, and is a source of danger to life and property; whereas the necessity for such, track is now obviated by the construction of another track more direct to New York, therefore resolved, that the president, directors, and officers of the Morris and Essex railroad be directed, as soon as the road now in process of construe-' tion shall be finished and fit for use, forthwith to remove said track, and to repair the street through which the same passes, under the direction of the street commissioner. In answer to these proceedings on the part of the defendants, the complainants returned a written communication, assuming and asserting a legal right, on their part, to occupy the streets with their railroad, as the same was then constructed and used by them. On the third day of November last, the defendants passed a resolution, as follows : “ Resolved, that a special committee be appointed. *355 whose duty it shall be to cause the said railroad track to be taken up and removed with all possible despatch, to the end that proper measures may be taken to fepair and repave the said streets in the places where the said tracks now are.” On the morning after the passage of this resolution, the defendants, by their agents, commenced taking up and removing the railroad track in Broad street. The complainants then exhibited in this court their bill of complaint. They allege that, by their act of incorporation, they are invested with the legal right to occupy. Broad and Center streets in the manner they have used and occupied the same; that they located their road through those streets, and filed the location in the office of the secretary of state, according to the provisions of their charter;' that it would have been difficult, if not impracticable, to have located and constructed their road in the city of Newark to a junction with the New Jersey railroad, according to the meaning of their act of incorporation, without running along one or more of the streets, and that the line on which the road is constructed creates as little inconvenience as any line that could have been adopted. The complainants further allege in their bill of complaint, that the legislature of the state has, by several acts, passed in reference to the location and route of this road, sanctioned its location in the public streets of Newark; that the defendants suffered them to make their location, and construct their road without objection, and they have since, by several official acts, acquiesced in and assented to the right, which the complainants claim as a legal one, by which acts the complainants were involved in expenditures of money amounting to several thousands of dollars. IJpon this bill an injunction was granted, not hastily, but upon due consideration of all the facts stated by the complainants. I still think it was properly granted. The road had been in use for nearly sixteen years. There was no pressing necessity for its immediate or hasty removal. The defendants, after an *356 opportunity of answering, and presenting their case to the court, have not pretended that there was any exigency which required the immediate removal of the railroad, without affording the complainants an opportunity of asserting and trying their rights before the legal tribunals of the state. It would have been a reproach upon the jurisprudence of New Jersey if there had been no way provided by which the complainants’ property could have been preserved from destruction until the opportunity was afforded them of a hearing.
The public excitement which existed in the city of Newark did not make this court falter one moment in discharge of its duty. The injunction was issued, and has been respected, and I have no cause to regret that the complainants fouud in this court a prompt and efficient protection to their property, until the opportunity was afforded them of a judicial determination as to their rights.
The defendants have filed their answer, with several affidavits annexed. Both parties have presented their case, and are now entitled to the decision of this court as to their rights.
The first and most important question for consideration is, whether, by their act of incorporation, any legal authority is given to the complainants to locate and construct their road upon a public street of the city of Newark ? In giving the company the privilege of constructing a railroad from Morristown, to intersect with the New Jersey railroad in the county of Essex, at Newark or at Elizabethtown, or between those places, it was necessary that the legislature should confer upon the company the legal power and authority to possess the lands which were necessary to -be occupied in constructing the road. There were two kinds of property necessary for the purpose— private property, and property in which the public had an interest distinct from any private or reversionary interest which might belong to any individual in the same, such *357 as public highways. In this charter, there is distinct and appropriate legislation as to both these kinds of property. The company is expressly authorized to occupy both. But the manner of that occupation, and the mode of acquiring it, and the title or right of property which the company acquires, are essentially different. As to private property, the company is to purchase the same of the owner; or, if an agreement cannot be made between them as to price, then the land is to be acquired by a mode of assessment particularly designated; and upon the payment of such assessment, the said company is deemed to be seized and possessed in fee simple of all such lands and real estate so appraised. As to public highways, which it was absolutely necessary the company should occupy in the construction of their railroad, the legislature made no provision for the company’s acquiring any title in them. The legislature had the power to authorize the company to occupy the public highways, either longitudinally or otherwise, either with or without compensation. The use of the public highways belongs to the public, although technically the fee to the land remains in the original owner and his assigns. They have not been dedicated to any particular mode of travel or use. They are intended, and are devoted to public convenience, and to the profit and pleasure of the public as thoroughfares. As the means of facilitating the intercourse, in matters of business or pleasure, between one city or town and another, or between one man’s dwelling house and farm and another’s; it is perfectly consistent with the purposes for which they were originally designated and intended, that the public authorities, who have the control of them as public highways, should adapt them, in their use, to the conveniences and improvements of the age.
For the legislature to authorize the use of a public highway for the purpose of a railroad, in such a manner as not entirely to destroy its use in the ordinary mode, is not inconsistent with the purposes for which the public *358 highway was originally intended. It may render the ordinary mode of travel less convenient, or perhaps dangerous ; and yet the benefit to the public, by the use of it as a highway upon an iron superstructure, may very greatly outweigh and overbalance such danger and inconvenience. The legislature must be the judges as to the benefit to the public, and to their authority individuals and the public must submit. If these views are correct, it follows, that where a public highway is used by a railroad company in common with the public under the sanction of legislative authority, it may enjoy such use without making compensation to the owners in fee of the adjacent lands, and that the legislature may authorize such use without providing compensation, even under the existing constitution of the state, which provides that individuals or private corporations shall not be authorized to take private properly for public use without just compensation first made to the owners. The authority to use a public highway for the purpose of a railroad, retaining the use of such highway for all ordinary purposes, subject only to the inconvenience of the railroad, is not such taking of private property from the owner of the fee of the adjacent lands as is contemplated by this provision of the constitution. The easement of the highway is in the public, although the fee is technically in the adjacent owner. It is the easement only which is appropriated, and no right or title of the owner interfered with.
If the legislature authorizes the company to take the highway, and appropriate it to its own use, by destroying the ordinary and legal right of the public to use it as a highway, then compensation must be provided; because when the rights of the public in it ceases, then the use of it reverts to the person who holds the fee in the land. Then the legislature authorizes to be taken something which belongs to the land owner, to wit, the use of the land. But while it is preserved as a common public highway, the use of it does not belong to the owner of the *359 fee any more than it does to any other individual of the community. The legislature, therefore, does not, by permitting the company to use the public highway in common with the public, take away from the land owner anything that belongs to him. It is not a misappropriation of the way. It is used, in addition to the ordinary mode, in an improved mode for people to pass and repasa. These views correspond with those of the Court of Appeals in the state of New York in the case of Williams v. The New York Central Railroad Company (18 Barb. Sup. C. R. 222) respecting the construction of a similar provision in the constitution of that state. It followá*further, admitting the correctness of the views expressed, that the adjacent land owner cannot maintain an action at law for consequential damages, unless he can show a negligent exercise by the company of their legal rights; because no action at law will lie for a consequential injury necessarily resulting from the exercise of a legal right under legislative authority. This principle was broadly affirmed in the case of Radcliffe’s Executors v. The Mayor, &c., of Brooklyn (4 Com. Rep. 195) by the Court of Appeals of the state of New York. The Supreme Court of that state, in the ease of Chapman v. The Albany and Schenectady Railroad Company (10 Barb. R. 369) held, that “a railroad corporation, constructing its road through one of the streets of a city, in pursuance of authority granted by the legislature, and with the consent of the common council of the city, is not liable for consequential damages sustained by persons owning land adjacent to the street, provided the authority given to the company is exercised with proper care and skill.” The same principle was reaffirmed in the late case of Williams v. The Central Railroad Company of New York, before referred to, and is further maintained and supported in tbe numerous authorities referred to by tbe counsel and court in the report of the last named case. I have examined more fully this branch of the case, because it was very fully argued by counsel; and for the purpose *360 of showing that no fair inference can he drawn against the right set up by the complainants, from the fact that their charter provides no mode of compensation to land owners adjacent to public highways. But the charter of the company does expressly provide for the mode in which public highways are to be used by them in the construction of their road, and imposes a duty upon the company in appropriating them to such use. Immediately after providing the mode by which lands of individuals may be acquired and taken, it is enacted, “ that it shall be the duty of the company to construct and keep in repair good and sufficient bridges or passages over or under the said railroad or roads, where any public or other road shall cross the same, so that the passage of carriages, horses, and cattle on the said road shall not be impeded thereby.” There is no other provision in the charter respecting the land which the company is to take and occupy for the purposes of their road. It will thus be seen that ample provision is made for the company’s taking private property, and in reference to their crossing public highways. Whence do they derive their right to occupy the public highways bngitudinally, and thus appropriate them to their own use ? Their authority must be found, if anywhere, in their act of incorporation. It is not expressed in the act; and if it can be derived from it at all, it must be by implication. Is any such right to be implied from the charter, which clothes the complainants with all the legal power they possess ? The complainants are authorized to construct a railroad from Morristown to Newark. That was the object of their incorporation; and it is manifest, from the whole act, that it was the intention of the legislature to confer all the powers necessary to enable the corporators to carry out the object for which they were incorporated. I do not think that, because the legislature intended to confer upon the company all the powers necessary for them to carry out the object for which they were incorporated, they are therefore necessarily clothed *361 with all powers to meet that necessity, and that where not expressed, such powers are to be derived by implication. In a limited sense, the proposition is true. It is true, as a general proposition, when the power sought to he implied does not take away or impair the legal rights of individuals or of any other corporation. Suppose the general power had been conferred to construct a railroad from Morristown to Newark, without anything being said as to the occupation of land, or the mode of acquiring it, the power to hold land for the purpose would flow as a necessary implication from the character of the franchise; but ihe power to take the land without the consent of the land owner would not bo implied, even irrespective of the consideration of any constitutional difficulties that might be interposed. In the case of The Inhabitants of Springfield v. The Connecticut River Railroad Company (4 Cushing's Rep. 63), to be found in 1 American Railway Cases 572, the Supreme Court of Massachusetts held, that “ an act of the legislature, which authorizes the construction of a railroad between certain termini, without prescribing its precise course and direction, does not prima facie confer power to lay out the road over and along an existing public highway; hut it is competent for the legislature to grant such authority, either by express words or by necessary implication: and such implication may result either from the language of the act, or from its being shown by an application of the act to the subject matter, that the railroad cannot, by reasonable intendment, be laid in any other line.” I am unwilling to adopt this principle as broadly as it is laid down. I yield an assent to the reasoning of the court, much more readily than to the conclusion deduced from it. The same court say, “ Had it been intended that railroad companies, under a general grant, should have power to lay a railroad over a public highway longitudinally, which ordinarily is not necessary, we think that would have been done in express terms, accompanied with full legislative provisions for maintaining such bar *362 riers and modes of separation as would tend to make the use of the same road, for both modes of travel, consistent with tbe safety of travellers on both. Tbe absence of ally such provision affords a strong inference that, under general terms, it was not intended that sucb a power should be given.” In tbis charter, tbe legislature have expressly provided for tbe use of public highways, where tbe same are crossed by tbe railroad, and have protected tbe public in their ordinary use and enjoyment of tbe same. And yet it is contended, that from tbis same act, an implied power is derived to use tbe public highways in a manner which may be totally destructive of their ordinary public use. In other words, tbe legislature have been guilty of tbe absurdity of express legislation to protect tbe public from a lesser evil, and while so doing have left room for tbe implication of a power to inflict tbe same evil, but in a greater magnitude.
If nothing bad been said in tbe act of incorporation as to crossing of public highways, that power would have been derived by implication, because it is impossible to construct a railroad from Morristown to Newark without sucb crossing. Tbe same necessity for occupying public highways longitudinally does not exist, and must, from tbe nature of tbe case, have so appeared to tbe legislature. And yet they were not willing to leave tbe power of crossing public highways to mere implication. There was less necessity for legislative action with reference to crossing public highways; and yet upon tbis they have legislated. It shows that tbe whole subject was in tbe mind of tbe legislature; and for that reason, I think, we should not too readily draw any power regarding it by mere implication.
Tbe legislature of tbe state has conferred upon certain corporate bodies tbe control and supervision of tbe public highways. Those bodies are responsible for tbe proper maintenance and repair of these ways. They may be arraigned before tbe criminal tribunals of tbe land for a *363 neglect of duty in the execution of the trust committed to them. These provisions are made for the benefit of the public, and for its protection. The public have rights in the public highways of the state, which can be impaired or interfered with by nothing short of authority conferred by the sovereign power of the state itself. That authority must be expressly given; or if conferred by implication, it must be a necessary implication, such as will necessarily and naturally flow out of the law from whence it is derived, not a necessary implication to be whittled down into a reasonable intendment, and then to become a mere matter of expediency, and then to be resolved into a mere question of dollars and cents.
The right is not given by this charter in express terms, and I do not think it can be implied from any of its provisions, which will authorize this company to appropriate for the purposes of their railroad more than one half mile of the principal public highways of Newark, without the consent of the appropriate public authorities of the city„ I do not think that the company can occupy these streets without such consent, even upon the principle of construction as to legislative grants, as laid down by the court in the case of The Inhabitants of Springfield v. The Connecticut River Railroad Company. In that case, the court referred it to three commissioners to consider and report upon an examination and survey of the country between the termini of the road, whether it was, by fair and reasonable intendment, necessary to lay out and construct the road upon and along Trout street, in the town of Springfield, or either of the public highways in Oabotville, or not. The only object of such a reference is to give information to the court. No inquiry need be instituted in this case to ascertain the fact, whether it was, by fair and reasonable intendment, necessary to occupy Broad and Center streets, in the city of Newark, in order to enable the complainants to intersect with their railroad the railroad of the New Jersey Hailroad and Transportation Company at *364 Newark, or at Elizabethtown, in the county of Essex, or between those places. Any one acquainted with the general face of the country knows that it is practicable to make such intersection without occupying’ longitudinally any of the public streets of Newark.
Being of opinion that the complainants have no right, by law, to occupy Broad and Center streets for their road, it is unnecessary for me to consider another question, argued by counsel and made by the pleadings, whether the company did make and file the location of this part of their route in conformity to their charter, and the effect upon their rights on account of a neglect to do so.
The next important inquiry is, whether the defendants gave their consent for the use of these streets by the complainants, and as to the extent and effect of such consent, if given.
In the statement of their case by their bill, the complainants do not allege that they ever asked the consent of the defendants for the use and occupation of their streets; nor is it alleged or insisted that any such consent was proffered or given in express terms. It is admitted that no express consent was given. But the complainants allege and insist that such consent is to be implied from various facts and considerations, which are specifically set forth in the bill. ¥e will examine them in the order in which they are stated.
Eirst, it is alleged that, at the time of determining upon, and locating the road, and of constructing the same in Broad and Center streets, no objection was made to the same on the part of the public authorities of the city of Newark; and that having stood by and seen the complainants expend their money, and making no objection, the defendants are estopped from denying the complainants’ right to the easement which they claim.
In the case of Rerick v. Kern (14 Serg. & R. 267, 262,) it was held, “ that an executed license, the execution of which has involved the expenditure of money or labor, *365 is regarded, in equity, as an executed agreement for valuable consideration, and as such will be enforced, even when merely verbal and relating to the use or occupation of real estate.” “So, if a party having a title to an estate should stand by, and allow an innocent purchaser to expend money upon the estate, without giving him notice, he would not be permitted by a court of equity to assert that title against such purchaser, at least not without fully indemnifying him for all his expenditures.” 1 Story’s Eq. J. § 885.
The complainants are not entitled to any protection in a court of equity by the application of these principles to their case. There was no license given, either by parol or in writing, nor can any fraud be inferred from the fact, that the defendants did not interfere, but stood by in silence while the complainants expended their money in the construction of their road upon the public highways. The same principle of law is applicable to the complainants, in their encroachment upon and use of the highways as to individuals. An individual erects a portico, or court yard fence, or awning posts, upon the street, or encroaches upon it with his building. Tie cannot set up a legal right to continue them there permanently, on the plea that the public authorities did not interfere with their erection. He placed them there with full knowledge of his rights, subject to the paramount right of the public. To ascertain how far the complainants can set up the silence or acquiescence of the defendants as a constructive fraud, so as to entitle them to the principle, as stated by Mr. Justice Story, we must look at the circumstances which induced such silence and acquiescence. The defendants admit that they did not remonstrate, and give the reasons why they did not. The city of Newark had then a small population, in comparison with its present number. The wants of the city for its public thoroughfares have since then greatly increased; large expenditures have been required in paving and grading the streets to *366 meet the growing necessities of the public; sewers are demanded and other conveniences, to which streets in a city are properly and legally appropriated. The complainants occupied the streets subject to all these contingencies. "When this road was originally constructed, it was of no serious detriment to the public. The fact, that the public authorities did not interfere while the inconvenience was tolerable, ought not to be construed into a fraud, on their part, to deprive them of their rights. The indulgence which they have shown the complainants ought not, by a court of equity, to be construed into a wrong. It is shown that the defendants have submitted to the inconveniences occasioned by the railroad, until the complainants have provided themselves with another intersection of the New Jersey railroad in the city of Newark, and are thus in the enjoyment of all the privileges the original charter was designed to confer. "Without the road through the public streets of Newark, the complainants are in the enjoyment of a railroad from Morristown intersecting the road of the New Jersey Railroad and Transportation Company in the city of Newark. In addition to these considerations, the complainants themselves show that the road through these streets was not designed, and has never been used as the main line of their railroad, but only as a temporary track, or spur, to their main road. They have never used it with locomotive power, nor have they ever asserted their right to do so; and they admit it is not now used in any way for the conveyance or transportation of passengers.
But the complainants set up other acts of the defendants as evidences of an acquiescence, on their part, to the right now claimed. They say, in their bill, that they have always conformed to the requirements of the common council of the city of Newark, or of their agents, in respect to the manner of keeping said track; that they have been required, from time to time, to pave between the rails, and for a space on each side outside of said rails; *367 that when the streets through which said track runs were lately graded and paved, they were assessed large sums of money towards paving, and that such assessments and payments made by them amount to several thousand dollars.
Now certainly these facts, so far from showing an acquiescence on the part of the defendants in the legal right of the complainants, as now asserted, amount to an assertion, on the part of the defendants, of their continued control of the streets, and to an admission, by the complainants, that they occupied them as a matter of indulgence, and subject to the control, will, and pleasure of the defendants. The defendants asserted tlieir control over the streets, and the complainants submitted to their authority. It is true the complainants lost no legal rights by tlieir submission to the city authorities, and it is equally true that they acquired none, either at law or in equity.
The complainants further insist, in the maintenance of the legal right asserted by them, that they have legislative sanction for the occupation of these streets.
On the 2d day of March, 1836, the legislature, by a supplement to the original act of incorporation, enacted that the said company be and were thereby authorized and empowered to vary the line of their railroad, as at first surveyed and recorded in the office of the secretary of state, at such places and points as, in the opinion of their engineer, might best promote the public convenience and the interest of the stockholders. And after-wards, on the 22d day of February, 1888, the legislature passed a further supplement to their original act of incorporation, and thereby enacted that the said company should have power to make such deviations from the line of their road as, from time to time, the directors thereof might deem expedient and proper. And after making provision for the payment of damages to land owners, the act further declares, that with that restriction and limitation, any deviations and changes theretofore made, *368 and coming within the principle of the said act, should be deemed as valid as though the same had been laid down and marked in the original return and survey of said road. By a proviso in the last supplement, it is declared that no such deviation, or lateral road, as is authorized by that supplement, should be made in the city of Newark without the consent of the common council of the city.
I can find no legislative sanction, in either of these acts, to the company’s occupying any public highway, without first obtaining the consent of the proper legal authorities having the control of such highway. The act of 1836 was passed before the road was constructed. It authorizes the company to vary the line of their road, as first surveyed and recorded in the office of the secretary of state. It neither established the legality of the survey, nor did it authorize the company, in varying it, to take or use property which the original act of incorporation did not authorize them to take.
The section of the act of 1838, referred to by the bill, and relied upon by counsel, merely authorizes the company to deviate from the line of their survey, reserving the rihgt to individuals to recover damages for all injuries sustained by such deviation. "With the same restriction and limitation, it confirms any deviations theretofore made from the original line of survey and location. It expressly prohibits any such deviation in the city of Newark, without the consent of the common council of the city. The mere circumstance that the legislature recognised the fact, that the road had been located, and that that location had been filed in the office of the secretary of state, as the act of incorporation provides, did not legalize that location, or give the company any additional power or rights than were conferred by their original charter. This was not in contemplation at the time the several supplements were passed. The reason of the statute was not because the company had taken or used pub- *369 lie highways, or any other land, which they might not have taken under their original powers. “ The reason of the statute, that is the motives which led to the making of it, the object in contemplation at the time the act was passed, is a criterion by which to ascertain the true meaning of the act. Attention should be paid to the circumstances, whenever there is a question either of explaining an obscure, ambiguous, indeterminite passage in an act of the legislature, or of applying it to a particular case.” Smith’s Com. § 491, quoting Puffendorf, who says : “ But that 'which helps us most in the discovery of the true meaning of the law, is the reason of It, or the cause which moved the legislature to enact it.” The reason for the passage of the several acts referred to was not because the company had exceeded their power in the appropriation of public highways; nor was it the object of the act, or the intent of the law makers, to sanction any such usurpation of power. The reason of the act and the intention of the legislature are both clear; there is no doubt or obscurity as to the objects and purposes of its application. To construe these laws into a legislative sanction of the appropriation by the company of public highways, is a perversion in the application of the acts to purposes not intended. The assumption, that it was an object of these acts to sanction the construction of the road on the public streets of Newark, is an admission that the streets were illegally used by the company for that purpose, and is inconsistent with the pretension, now assumed, of legal right and authority under their original act of incorporation.
The Morris and Essex Railroad Company have no right to occupy or use Broad and Center streets, in the city of Newark, in the manner the same are now appropriated by them, without the consent of “the mayor and common council of the city of Newark.” The acts of the defendants, upon which the complainants rely as establishing such consent, are not sufficient to draw from them any *370 such inference. The legislative enactment, upon which the complainants rely as establishing or confirming the right of the company to occupy the streets in question, will not warrant such a construction. The defendants are therefore entitled- to have the injunction dissolved with costs. The order will be made to that effect.